# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: March 6, 2024

```
* * * * * * * * * * * * * * * *
EDGAR JONES,                      *      No. 20-523V
                                  *
              Petitioner,         *      Special Master Sanders
                                  *
 v.                               *
                                  *
SECRETARY OF HEALTH               *
AND HUMAN SERVICES,               *
                                  *
              Respondent.         *
* * * * * * * * * * * * * * * *
```

*Leigh Finfer*, Muller Brazil, LLP, Dresher, PA, for Petitioner.
*Alexa Roggenkamp,* U.S. Department of Justice, Washington, DC, for Respondent.

## FACT RULING[1]

On April 28, 2020, Edgar Jones ("Petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program.[2] Petitioner alleged that he suffered from mononeuropathy of the right radial nerve as a result of an influenza ("flu") vaccine administered on November 9, 2018. Pet. at 1, ECF No. 1. Respondent filed his Rule 4(c) report on March 22, 2021, and argued that "this case is not appropriate for compensation under the terms of the Act." Resp't's Report at 1, ECF No. 20. On August 19, 2022, Petitioner filed a motion for a ruling on the record requesting a finding that "Petitioner received an intramuscular influenza ("flu") vaccine in his right arm." Pet'r's Mot. at 1, ECF No. 36. For the reasons discussed herein, I find that Petitioner has provided preponderant evidence that his November 9, 2018 flu vaccine was administered in his right arm.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10 et seq. (hereinafter "Vaccine Act," "the Act," or "the Program"). Hereafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

## I.   Procedural History

Petitioner filed his petition, medical records, and affidavits on April 28, 2020. Pet'r's Es. 1-11, ECF No. 1. Petitioner then filed his statement of completion on April 30, 2020. ECF No. 7. This case was assigned to the Special Processing Unit, and an initial status conference was held on June 15, 2020. Min. Entry, docketed June 15, 2020; Scheduling Order, ECF No. 11. Petitioner was ordered to file a status report with clarification on outstanding concerns raised by Respondent, remaining outstanding medical records, and an updated affidavit. Scheduling Order, ECF No. 11. On September 23, 2020, Petitioner filed additional medical records, a supplemental affidavit, and a status report indicating that one set of records remained outstanding. Pet'r's Exs. 9-12, ECF No. 14; Status Report, ECF No. 15. Petitioner then filed the additional medical records, accompanied by a statement of completion, on November 16, 2020. Pet'r's Ex. 14; ECF No. 16; Statement of Completion, ECF No. 17.

On March 22, 2021, Respondent filed his Rule 4(c) report. Resp't's Report, ECF No. 20. Respondent stated that this claim has not met the prima facie burden to prove causation-in-fact for two reasons. First, "although [P]etitioner contends that he received the vaccination in his *right* shoulder. . .handwritten notations on the vaccination record indicate that the vaccine was administered in his *left* shoulder." *Id.* a 5. Additionally, Petitioner has not yet proven "a causal link between the alleged injuries and a covered vaccine" for a causation-in-fact claim. *Id.* at 6. Thus, Respondent recommended against compensation. *Id.* at 1.

On June 10, 2021, SPU issued an order to show cause directing Petitioner to "file additional documentation or other evidence needed to establish that the. . .vaccine was administered in his right arm as alleged." Show Cause Order at 3, ECF No. 21. In response, Petitioner filed a status report on July 27, 2021, which asserted that Petitioner had no additional evidence, outside of the affidavit and medical records previously filed, to support the assertion that the vaccine was administered in his right arm. Status Report, ECF No. 22. Petitioner further asserted that "the site of injection is not determinative in establishing a causal link" and requested the opportunity to obtain an expert report on this matter. *Id.* at 1-2. On August 13, 2021, SPU held a status conference to discuss this matter.

One week later, on August 20, 2021, Petitioner file a motion to issue a subpoena to Mosby's Drug Store for any and all documentation related to Petitioner's November 9, 2018 flu vaccination. Pet'r's Mot., ECF No. 23. That same day, SPU granted the motion and issued the subpoena with a deadline of September 23, 2021 to file the vaccine documentation. Order, ECF No. 24. Petitioner did not file the vaccine documentation in compliance with this deadline and an order to show cause was issued on October 5, 2021. Order, ECF No. 25. In response, Petitioner filed an affidavit by a pharmacist and a motion for an extension of time, which was granted on November 5, 2021. Pet'r's Ex. 14, ECF No. 27; Motion, ECF No. 27; Order, docketed Nov. 5, 2021. On December 16, 2021, Petitioner filed Mosby's Drug Store's response to the subpoena, a status report, and a statement of completion. Pet'r's Ex. 15, ECF No. 29; Status Report, ECF No. 30; Statement of Completion, ECF No. 31. On January 26, 2022, an informal communication was docketed, stating that the SPU staff attorney corresponded with the parties via email regarding the vaccine record and how Petitioner intended to proceed. Informal Com., docketed Jan. 26, 2022.

The Case was reassigned to me on February 9, 2022. ECF Nos. 32-33. I held a status conference between the parties on April 26, 2022. Minute Entry, docketed Apr. 26, 2022. I ordered Petitioner to file "medical literature to explain whether the presentation of Petitioner's injury is consistent with mononeuropathy" and "any evidence [Petitioner] could obtain demonstrating pain from the date of his vaccination and showing the pain's impact on his activities." Order at 1, ECF No. 34. On June 28, 2022, Petitioner filed a status report where he requested a briefing schedule for a factual ruling regarding the site of the vaccination, as opposed to the expert report schedule. Status Report, ECF No. 35. Petitioner stated that he no longer believed that he could pursue this claim "even if the site of vaccination was determined to his left rather than right arm." *Id.* at 1.

On August 19, 2022, Petitioner filed a motion for a ruling on the record. Pet'r's Mot., ECF No. 36. Respondent filed his response on September 26, 2022. Resp't's Resp, ECF No. 37. Petitioner filed a reply on October 17, 2022. Pet'r's Reply, ECF No. 38.

This matter is now ripe for consideration.

## II.    Summary of Relevant Evidence

### a.   Medical Records

Prior to vaccination, Petitioner had a medical history including erectile dysfunction, hyperlipidemia[3], and hernia repair. Pet'r's Ex. 2 at 7; Pet'r's Ex. 4 at 39. Petitioner also reported neck and shoulder pain following a motor vehicle accident on March 16, 2013. Pet'r's Ex. 10 at 4. A subsequent x-ray revealed mild straightening and degenerative disc disease. *Id.* at 3. Also, while playing tennis on July 20, 2014, Petitioner dislocated his right shoulder. Pet'r's Ex. 12 at 21; Pet'r's Ex. 13 at 4. Petitioner experienced symptoms, including tenderness and limited range of motion, through October 28, 2014. Pet'r's Ex. 13 at 2-8.

On November 9, 2018, Petitioner received the flu vaccine at Mosby's Drug Store in Canton, Mississippi. Pet'r's Ex. 1 at 3. The vaccination record includes a handwritten note stating, "IM Left Arm." Pet'r's Ex. 1 at 3. On February 13, 2019, over three months post-vaccination, Petitioner presented to Dr. Paul Douglas Vanlandingham at Baptist Memorial Hospital-Mississippi Baptist Medical Center with complaints of "severe pain in the right upper arm spreading up into the right side of his neck." Pet'r's Ex. 2 at 2. Petitioner reported that he experienced an "immediate onset of pain that radiated down the whole arm" at the time of the vaccination. *Id.* Petitioner also reported that the pain has slowly progressed up across his shoulder and into his neck, getting worse with time. *Id.* Petitioner reported no numbness or tingling. *Id.* A physical examination showed a good range of motion with no limitations, but tightness and shortening of the trapezius muscle on the right side of the neck was noted. *Id.* at 3. Petitioner's reflexes were 2+. *Id.* Dr. Vanlandingham found that Petitioner had paraspinous muscle spasms in his neck and referred him to physical therapy. *Id.* at 6.

---

[3] Hyperlipidemia is "a general term for elevated concentrations of any or all of the lipids in the plasma, such as hypertriglyceridemia or hypercholesterolemia." *Dorland's Illustrated Medical Dictionary* at 880 (32nd ed. 2012) [hereinafter "*Dorlands*"].

3

On February 26, 2019, Petitioner presented to physiatrist Dr. Michael Winklemann at NewSouth Neurospine. Pet'r's Ex. 5 at 22. Dr. Winklemann noted that he is friends with Petitioner. *Id.* Petitioner reported "immediate significant pain in the right shoulder" after the vaccine and has been experiencing persistent pain for three months. *Id.* On examination, Petitioner had slightly decreased reflexes, weakness in his right triceps. and tenderness in his upper trapezius. *Id.* Dr. Winklemann's differential diagnosis was injection neuritis[4] and a C7 radiculopathy.[5] *Id.* Dr. Winklemann directed Petitioner to get a cervical MRI and consider an electromyogram ("EMG")/nerve conduction study if the MRI was unremarkable. *Id.* Petitioner also received a short course of physical therapy and an injection of Marcaine and Depo-Medrol in the upper trapezius and cervical paraspinals during this visit. *Id.* That same day, Petitioner presented to River Oaks Hospital Department of Radiology for a cervical spine MRI. *Id.* at 30. The MRI revealed spondylosis.[6] *Id.*

On March 5, 2019, Petitioner presented to NewSouth Neurospine for a physical therapy initial evaluation. Pet'r's Ex. 5 at 9. Petitioner attended five physical therapy sessions from March 5, 2019 until March 21, 2019. *Id.* at 5-9. On March 7, 2019, Petitioner presented to NewSouth Neurospine to undergo an EMG/Nerve Conduction Study. *Id.* at 20. The diagnostic examination revealed mononeuropathy of the right radial motor branch to the lateral head of the triceps. *Id.* at 21.

On April 2, 2019, Petitioner returned to Dr. Winklemann at NewSouth Neurospine for a follow-up appointment. Pet'r's Ex. 5 at 18. Dr. Winklemann noted that Petitioner has not seen much improvement in the pain and weakness with physical therapy. *Id.* Dr. Winklemann further remarked that Petitioner's neuropathy was consistent with "needlestick-induced paralysis" and that recovery would likely be slow over a period of six to eight months, but there will most likely be a resolution to the condition. *Id.*

Petitioner returned for another follow-up with Dr. Winklemann on April 24, 2019. *Id.* at 17. Dr. Winklemann noted that Petitioner was seeking compensation for this injection-related injury. *Id.* Dr. Winklemann also wrote that Petitioner's EMG "confirmed the concern of an injection-related injury in the posterior aspect of his right arm" and that Petitioner "clearly did sustain an injury secondary to needle stick." *Id.* While Petitioner is expected to show some level of recovery, Dr. Winklemann remarked that "further evaluation in the near future will have to be performed in order to clarify that." *Id.*

Petitioner returned for follow-up appointments with Dr. Winkleman where he received trigger point injections on May 13, July 1, and August 14, 2019. Pet'r's Ex. 5 at 11, 13, 15.

---

[4] Neuritis is "inflammation of a nerve, with pain and tenderness, anesthesia and paresthesias, paralysis, wasting, and disappearance of the reflexes." *Dorland's* at 1245.

[5] Radiculopathy is "disease of the nerve roots, such as from inflammation or impingement by a tumor or a bony spur." *Dorland's* at 1547.

[6] Spondylosis is "ankylosis of a vertebral joint" or "degenerative spinal changes due to osteoarthritis." *Dorland's* at 1725.

### b. Affidavits

#### 1. Affidavit of Petitioner

Petitioner filed his sworn affidavit on April 28, 2020. Pet'r's Ex. 7 at 1. Petitioner recalled receiving a flu vaccine in his right shoulder on November 9, 2018 at Mosby's Drug Store in Canton, Mississippi. *Id.* Petitioner stated that the administering pharmacist was William Forbes, whom Petitioner had known for at least 15 years. *Id.* Petitioner recalled signing and dating a "Screening Checklist" produced by Mosby's Drug Store. *Id.* Petitioner stated that he "did not see Mr. Forbes initial the form or make any handwritten notations, as this was done outside of [Petitioner's] presence." *Id.* Petitioner noted that while the Screening Checklist includes a handwritten notation by Mr. Forbes stating, "IM Left Arm," that this notation is incorrect. *Id.* Petitioner recalled that he "was standing with the right-side of [Petitioner's] body towards Mr. Forbes when he administered the vaccine into [Petitioner's] right shoulder." *Id.*

Petitioner stated that he "experienced intense pain upon the administration of this vaccine, causing [his] knees to buckle." *Id.* at 1-2. He recalled that the "pain slowly subsided over the next few days, but residual soreness remained." *Id.* at 2. Petitioner noted that by January 2019, his "right shoulder pain had not resolved" and he "chose to wait for [his] previously scheduled wellness exam on February 13, 2019 to seek medical treatment." *Id.*

Petitioner stated that he sustained "an injury to the right radial nerve caused by the administration of the influenza vaccine." *Id.* Petitioner also recalled that he has "suffered the residual effects or complications of this injury for more than six (6) months." Petitioner stated that he continues "to experience sporadic pain associated with sitting or standing for long periods, repetitive work with [his] right arm, or driving for more than one (1) hour." *Id.*

#### 2. Supplemental Affidavit of Petitioner

Petitioner filed a supplemental affidavit on September 23, 2020. Pet'r's Ex. 9. In addition to reaffirming that Petitioner received his flu vaccination on November 9, 2018 and sustained an injury to the right radial nerve, the effects of which lasted over six (6) months, Petitioner also detailed his injury history. Pet'r's Ex. 9.

Petitioner stated that he was involved in a motor vehicle accident on March 16, 2013 where his "vehicle lost a rear wheel and ran off the road" in Canton, Mississippi. *Id.* at 1. Petitioner's car was towed and the police were called. *Id.* Petitioner recalled that the "officer informed [him] that he likely would not make a report because only one (1) car was involved, no injuries were reported and there was no property damage." *Id.* Petitioner noted that he called the Canton Police Department a few weeks later and was informed that there was no report of the accident. *Id.* Petitioner further recalled that his "neck was a little tender" and his wife took him to the MEA Clinic in Madison, Mississippi where he underwent x-ray examinations of the neck. *Id.* The results of the x-ray were "essentially normal" and Petitioner was prescribed Nabumetone which he took for a few days. *Id.* Petitioner stated that he "felt fine" by the next few days and tried a case in court that week. *Id.* Petitioner noted that he "experienced no residual neck pain or limitations since that time." *Id.*

Petitioner noted that on July 20, 2014, he "tripped while playing tennis and sustained a musculoskeletal injury to [his] right shoulder." *Id.* at 1-2. Petitioner recalled that his wife drove him to the Emergency Department at St. Dominic-Jackson Memorial Hospital where he underwent right shoulder x-ray examinations, which revealed a right shoulder dislocation. *Id.* at 2. Petitioner stated that he was discharged with "instructions to keep [his] right arm in a sling for four (4) weeks." *Id.* Petitioner further stated that one (1) week later, his shoulder dislocated again when he reached to scratch his head while watching television at home with his arm out of the sling. *Id.* Petitioner recalled returning to the Emergency Department at St. Dominic-Jackson Memorial Hospital where the treating physician adjusted his shoulder back into the socket and reminded Petitioner to wear the sling at all times for four (4) weeks. *Id.* Petitioner noted that he presented to Dr. Edward James at Jackson Orthopaedic Clinic for a few follow-up appointments, eventually being discharged on October 28, 2014. *Id.*

Finally, Petitioner concluded that he "had no trouble with [his] right arm or shoulder from 2014 until [he] received the flu vaccine in November of 2018." *Id.* Petitioner further stated that he is "a beekeeper and regularly lift[s] hive boxes weighing fifty (50) pounds or more. [He] also do[es] heavy yard work and tend[s] to [his] wife's garden." *Id.* Petitioner recalls that he had no issues performing these physical activities following his 2014 shoulder dislocation.

### 3.   Affidavit of Dorothy Chadwick

Petitioner filed an affidavit of Dorothy Chadwick, his wife, on April 28, 2020. Pet'r's Ex. 8 at 1. Ms. Chadwick recalled that Petitioner returned home from his vaccination and showed his shoulder, "comment[ing] that the shot was the most painful he had ever gotten." *Id.* at 1. Ms. Chadwick further stated that "[f]or several days [Petitioner] complained about how bad his shoulder hurt and thought maybe he was having a reaction to the vaccine." *Id.*

After a month or so, Ms. Chadwick advised Petitioner to go to the doctor, but he opted to "give it some more time" because "it was getting a little better." *Id.* Ms. Chadwick noted that sometime in January 2019, Petitioner "said he was really concerned that something was wrong with his shoulder and neck, but he was going to hold off seeing a doctor until his annual wellness exam. . .in February." *Id.* Ms. Chadwick stated that upon Petitioner's arrival home from his wellness exam, Petitioner informed her that Dr. Vanlandingham remarked that he "could actually see [Petitioner's] right shoulder was 'sagging.'" *Id.*

Ms. Chadwick summarized that "[f]or over one (1) year, [she] has witnessed [Petitioner] suffer from pain and soreness in his right shoulder and neck after he received the flu vaccine in November 2018." *Id.* Ms. Chadwick stated that Petitioner "cannot sit or stand for a long time without experiencing pain." *Id.* Ms. Chadwick added that Petitioner's "right shoulder and neck have started getting better" in the past three months, and he does not complain about the pain except for when he has to drive long distances, which "causes pain after several hours behind the wheel." *Id.*

6

#### 4.   Affidavit of William Forbes

Petitioner filed an affidavit of William Forbes, the administering pharmacist, on October 25, 2021. Pet'r's Ex. 14. Mr. Forbes has also known Petitioner "for over 5 years." *Id.* Mr. Forbes stated that he is a member of the Mississippi Board of Pharmacy and he sometimes worked part-time as a pharmacist at Mosby's Drug Store in 2018. *Id.* at 1. Mr. Forbes recalled that he "administered [Petitioner]'s influenza vaccination on November 9, 2018." *Id.*

Mr. Forbes stated that he reviewed the vaccination screening card and "recognize[d] the customer's name, [Petitioner], and [his] signature and handwriting." *Id.* at 1-2. However, Mr. Forbes noted that he does "not remember the details of [Petitioner's] vaccination on November 9, 2018, as it was normal for [him] to give several vaccinations on any given day at Mosby's Drug Store." *Id.* at 2. Mr. Forbes further stated that he examined screening card where he wrote "IM Left Arm" but states that he "cannot swear to the accuracy of that entry, only that [he] made it." *Id.* Mr. Forbes explained his process as follows:

> I prepare a customer's vaccination only after I have reviewed the customer's signed vaccination screening card for contraindications. If there are no contraindications on the customer's signed card, then I prepare and administer the vaccination. The information I subsequently enter below my signature is not reviewed and signed by the customer.

*Id.* Mr. Forbes stated the following regarding Petitioner's vaccination screening card:

> As the vaccination card reflects, [Petitioner] did not review and sign the card as to its accuracy after receiving the vaccination, only before, so he could not have corrected any inadvertent error I may have made when writing down the injection site as "Left Arm" instead of "Right Arm."

*Id.* Mr. Forbes concludes with the following statement:

> If [Petitioner] has sworn under oath that I gave his vaccination in his right arm on November 9, 2018, and his subsequent medical history supports that sworn statement, then I could not, nor would I contradict [Petitioner]'s personal recollection of events that day.

*Id.*

### III.   Arguments of the Parties

#### a.   Petitioner's Motion

Petitioner argues that the evidence demonstrates that he "received an intramuscular influenza vaccination in his right arm on November 9, 2018." Pet'r's Br. at 8, ECF No. 36. He continues that "[e]ach time Petitioner presented to a new treating physician, he stated that he received a flu vaccine in his right shoulder." *Id.* On February 13, 2019, during Petitioner's first

visit to his primary care physician, he stated that his symptoms "all started with a flu shot that was given in the root right deltoid muscle." *Id*. *See also* Pet'r's Ex. 4 at 47. On February 26, 2019, during Petitioner's first visit with Dr. Winkelmann, Petitioner stated "that he had a right-sided upper arm injection." Pet'r's Br. at 8. *See also* Pet'r's Ex. 5 at 22. On March 5, 2019, during Petitioner's first physical therapy appointment, he stated "that he received a flu shot in his right shoulder." Pet'r's Br. at 8. *See also* Pet'r's Ex. 5 at 9.

Petitioner further argues that in addition to his consistent presentation to treating physicians, others reiterate that the vaccination occurred in Petitioner's right arm. Petitioner cites to Ms. Chadwick's affidavit, which recalled that "when Petitioner showed her the site of the vaccination. . .he showed her his right arm." Pet'r's Br. at 8. *See also* Pet'r's Ex. 8 at 1. Petitioner also cites to Dr. Windelmann's diagnosis of a "vaccination injury" of Petitioner's right shoulder that was "secondary to a needle stick" after a clinical exam and EMG/nerve conduction study. Pet'r's Br. at 9. *See also* Pet'r's Ex. 5 at 17.

Petitioner continues that the "*sole mention* of a left shoulder site of injection for Petitioner's flue vaccination in the 'Screening Checklist for Contraindications to Inactivated Injectable Influenza Vaccination' completed by Petitioner at the time of his vaccination." Pet'r's Br. at 9. Petitioner argues that "vaccination records do not warrant the presumption of accuracy given to typical treatment records." *Id.* Further, Petitioner cites to the affidavit of Mr. Forbes, the administering physician, who "admitted that he could not swear to the accuracy of the vaccine record." *Id. See also* Pet'r's Ex. 14 at 2. Petitioner also notes Mr. Forbes' affidavit that describes that he completes the form after the vaccination such that Petitioner did not review the note specifying which arm was vaccinated. *Id.*

Petitioner concludes with the following statement:

> Petitioner's medical records (excluding the vaccine record) are entirely consistent with the factual evidence provided. Moreover, the pharmacist has stated, under oath, that he doubts the accuracy of his notes on the vaccine record. It is therefore more probable than not that the vaccination was administered into Petitioner's right arm.

Pet'r's Br. at 10.

### b.  Respondent's Response

Respondent argues that "there is no objective evidence that the [P]etitioner received a flu vaccine in his right shoulder, so his motion must be denied." Resp't's Resp. at 1, ECF No. 27. In response to Petitioner's discussion of the presumption of accuracy of vaccination records, Respondent argues that while caselaw allows for some skepticism of pharmacy records, "this skepticism does not alter the Court's treatment of such records as medical records." Resp't's Resp. at 6.

Respondent also argues that the vaccine record has the indicia of reliability for two reasons. *Id.* First, Respondent points to the fact that the "Left Arm" note is handwritten by Mr. Forbes.

Respondent argues that the "handwritten nature of the record required more action from Mr. Forbes. . .which bolsters the reliability of its accuracy." Resp't's Resp. at 8. *See also* Pet'r's Ex. 14. Second, Respondent asserts that "Mr. Forbes' affidavit does not contradict the vaccine record; in fact, [his] statements bolster the presumption of the vaccine record's accuracy." Resp't's Resp. at 8. Respondent reasons that the fact that Mr. Forbes recognized the form, his signature, his handwriting, and the notation of "IM Left Arm" reaffirms the accuracy of the record. Resp't's Resp. at 8. *See also* Pet'r's Ex. 14 at 1-2.

Respondent further rejects Petitioner's argument regarding the other evidence of record, claiming that this evidence "is insufficient to demonstrate that Petitioner's vaccine was administered in the right arm." Resp't's Resp. at 9. He asserts that Petitioner's and Ms. Chadwick's affidavits were created in the court of litigation, many years later and are less reliable than the vaccination record. *Id.* at 10. Respondent adds that Ms. Chadwick was not present during Petitioner's vaccination. *Id.* Regarding the medical records, Respondent argues that the subsequent treatment records are insufficient to meet Petitioner's burden. *Id.* Specifically, Respondent cites to the fact that Petitioner did not report his pain to a treating physician until three months after the vaccination. *Id.* Respondent adds that "it does not appear that Dr. Vanlandingham performed any independent verification of [P]etitioner's assertion that his flu vaccine was administered in his right arm." *Id.* at 11. Similarly, Respondent argues that "Dr. Winklemann appears to have adopted [P]etitioner's own report that 'a flu vaccine needle hit a nerve in [his] right shoulder." *Id. See also* Pet'r's Ex. 5 at 24. Respondent concludes, "[b]ecause [P]etitioner's medical treatment records appear to rely on his own reporting that he received a flu vaccine in his right arm, these records do not constitute evidence of site of vaccination." Resp't's Resp. at 11.

### c.  Petitioner's Reply

In response to Respondent's arguments, Petitioner argues that "vaccination records are not considered contemporaneous medical records and are not afforded a presumption of accuracy." Pet'r's Reply at 1, ECF No. 38. Petitioner further rebuts Respondent's characterization of case law, arguing that there is no holding "that vaccination records are warranted the same presumption of accuracy." *Id. See also* Resp't's Resp. at 6, citing *Marion v. HHS*, No. 19-0495V, 2020 WL 7054414, at *9 (Fed. Cl. Spec. Mstr. Oct. 27, 2020); *Schmidt v. HHS*, 17-1530, 2021 WL 5226494, at *7.  Instead, Petitioner asserts that vaccination records "do not contain information supplied to facilitate diagnosis or treatment" so they should not be characterized as "medical records" under *Cucuras v. Sec'y of Health & Human Servs*. 993 F.2d 1525, 1528 (Fed. Cir. 1993). *See also* Pet'r's Reply at 2. Petitioner further reasons that because "[p]roper treatment is not hanging in the balance based on a vaccination and the documentation thereof," vaccination records are not contemporaneous medical records and should not be afforded the weight of such. Pet'r's Reply at 2.

Furthermore, in response to Respondent's argument that a handwritten note on a vaccine record is reliable, Petitioner notes Mr. Forbes' affidavit where he stated that he "cannot swear to the accuracy of the entry" and "would not contradict [Petitioner's] personal recollection of the events that day." Pet'r's Ex. 14 at 2. *See also* Pet'r's Reply at 3.

Lastly, Petitioner reiterates that the remaining evidence of record is sufficient to demonstrate that the vaccine was administered in Petitioner's right arm. Pet'r's Reply at 3. Specifically, Petitioner emphasizes that there is no treatment record, outside of the vaccination sheet, that contradicts Petitioner's assertions that his vaccination was administered in his right arm. *Id.*

## IV.   Applicable Legal Standard

To receive compensation under the Vaccine Act, Petitioner must demonstrate either that: (1) he suffered a "Table injury" by receiving a covered vaccine and subsequently developing a listed injury within the time frame prescribed by the Vaccine Injury Table set forth at 42 U.S.C. § 300aa-14, as amended by 42 C.F.R. § 100.3; or (2) that he suffered an "off-Table injury," one not listed on the Table as a result of her receipt of a covered vaccine. *See* 42 U.S.C. §§ 300aa-11(c)(1)(C); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1319–20 (Fed. Cir. 2006).

Special masters, as finders of fact, "are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence." Moberly, 592 F.3d at 1326. The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. § 11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993). Pursuant to Vaccine Act § 13(a)(1)(A), a petitioner must prove his claim by a preponderance of the evidence. A special master must consider the record as a whole but is not bound by any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. § 13(b)(1).

In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen*, 418 F.3d at 1280). This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Hum. Servs.*, 933 F.2d 1525, 1528 (Fed. Cir. 1993). Indeed, contemporaneous medical records are ordinarily to be given significant weight due to the fact that "the records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Id.* However, there is no "presumption that medical records are accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (finding that a special master must consider the context of a medical encounter before concluding that it

constitutes evidence regarding the absence of a condition.). While a special master must consider these opinions and records, they are not "binding on the special master or court." 42 U.S.C. § 300aa-13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record . . ." *Id.*

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony. The Court of Federal Claims has identified four such explanations for inconsistencies: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).

## V.    Discussion

Petitioner's vaccination record identifies his "Left Arm" as the site of his November 9, 2018 flu vaccination. Pet'r's Ex. 1 at 3. However, Petitioner asserts that this is inconsistent with the evidence of record and that he received his vaccination in his right deltoid. Pet'r's Br. at 8. Respondent argues that the evidence in the record is insufficient to establish, by a preponderance of the evidence, that Petitioner received his vaccination in his right deltoid. Resp't's Resp. at 5. I find that Petitioner more likely than not received his vaccination in his right deltoid.

Although the vaccination record indicates that Petitioner received his vaccination in his left deltoid, Petitioner stated in his sworn affidavit that he received the vaccination in his right deltoid. Pet'r's Ex. 7 at 1. *See also* Pet'r's Ex. 9 at 1. Petitioner recalled that he "experienced intense pain upon administration of this vaccine" and by January 2019, his "right shoulder pain had not resolved." Pet'r's Ex. 7 at 1-2. Petitioner explicitly recalled and asserted that the vaccination occurred in his right deltoid. The sworn affidavit of Ms. Chadwick, Petitioner's wife, echoed Petitioner's recollection of post-vaccination pain in his right arm. Pet'r's Ex. 8 at 1. While Ms. Chadwick was not present during Petitioner's vaccination, she is a witness to Petitioner's following symptoms.

Furthermore, the administering pharmacist, Mr. Forbes, submitted a sworn affidavit explaining his vaccination process. Pet'r's Ex. 14. Mr. Forbes noted that he includes the handwritten notes on the vaccination record *after* administering the vaccine, such that the patient does not review or sign the vaccination record with the handwritten notes included. *Id.* at 2. As such, Petitioner never saw, nor had the opportunity to correct, the handwritten note indicating that the vaccine was administered in his left arm. Additionally, Mr. Forbes stated that, considering Petitioner's sworn affidavit and subsequent supporting medical history, he "could not, nor would [he] contradict [Petitioner]'s personal recollection of events that day" that the vaccination had been in Petitioner's right arm. *Id.* It is notable that the creator of the sole record that stands against Petitioner's contention that the vaccine was administered in his right arm is not willing to attest that it is accurate.

11

Lastly, the medical records indicate that Petitioner repeatedly identified his right arm as the vaccination site when presenting to new treating physicians. Petitioner reported right shoulder pain after a flu shot in the right deltoid muscle to his primary care physician on February 13, 2019. Pet'r's Ex. 4 at 47. On February 26, 2019, during Petitioner's first visit with Dr. Winkelmann, Petitioner stated "that he had a right-sided upper arm injection." Pet'r's Ex. 5 at 22. Petitioner also reported right shoulder pain following a flu shot in his right shoulder to his physical therapist on March 5, 2019. Pet'r's Ex. 5 at 9. In fact, there is not a single medical record outside of the original vaccination record that indicated Petitioner received a left arm vaccination.

This is truly a case where the totality of the record must be considered to form a complete picture of Petitioner's experience and chronology. Petitioner consistently complained of a right shoulder injury and attributed said injury to his vaccine. The administering pharmacist could not attest to the accuracy of the "Left Arm" notation and explained that Petitioner did not review the record in full. Therefore, I find that Petitioner has satisfied his burden to establish it more likely than not that his November 9, 2018 flu vaccination was administered in his right shoulder.

## VI.    Conclusion

Based on the above reasoning, I find that Petitioner has provided evidence establishing it more likely than not that he received his flu vaccination in his right shoulder. Petitioner has fourteen (14) days from the filing of this ruling to file a status report indicating how he wishes to proceed.

**IT IS SO ORDERED.**

s/Herbrina D. Sanders
Herbrina D. Sanders
Special Master
